UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X    Case No.
JAMES TYSSELING,

                Plaintiff,

    -against-    **COMPLAINT**

THE AMERICAN KENNEL CLUB, INC.,
AKC PET CARE LLC d/b/a CANINE    **Jury Demand**
RETREAT and DENNIS SPRUNG,

                Defendants.
------------------------------------------------------X

        Plaintiff James Tysseling ("Plaintiff" or "Mr. Tysseling"), by and through his attorneys, FISHER TAUBENFELD LLP, alleges against Defendants The American Kennel Club, Inc. (AKC), AKC Pet Care LLC d/b/a Canine Retreat ("APC") (together with AKC, "The Organization") and Dennis Sprung (collectively "Defendants"), the following:

## NATURE OF THE ACTION

    1.    This action arises under the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 *et seq*. ("FMLA"); the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq*., as amended ("ADA"); and the Administrative Code of the City of New York § 8-101 *et seq*. ("City Law").

    2.    Based upon the following acts and/or omissions, Defendants knowingly violated Plaintiff's rights under federal and city laws, and such actions were committed intentionally and/or willfully, with knowledge that Plaintiff would be economically injured:

    a)    The Organization's retaliatory termination of Plaintiff's employment based on his request to exercise his FMLA rights and the Organization's interference with and/or restraining or denial of Plaintiff's exercise of his FMLA rights;

    b)       The Organization's refusal to grant Plaintiff a reasonable accommodation for his disability and discriminatory and retaliatory termination of Plaintiff's employment because of his disability and request for a reasonable accommodation, in violation of the ADA; and

    c)       Defendants' refusal to grant Plaintiff a reasonable accommodation for his disability and discriminatory and retaliatory termination of Plaintiff's employment because of his disability and request for a reasonable accommodation, in violation of City Law.

Damages and other legal relief are sought pursuant to the FMLA, ADA and City Law.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (original federal question jurisdiction). Supplemental jurisdiction over Plaintiff's City Law claims is conferred by 28 U.S.C. § 1367(a), as such claims are so related in this action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

4. Venue is proper in this District because Defendants conduct business in this District, and acts and/or omissions giving rise to the claims alleged herein took place in this district.

5. Pursuant to §8-502 (c) of the City Law, Plaintiff served a copy of this Complaint on the City of New York Commission on Human Rights and on the City of New York Corporation Counsel.

## PARTIES

### *Plaintiff*

6. At all relevant times, Plaintiff was a resident of Connecticut State who worked in the City of New York.

7. Plaintiff was at all times an "employee" within the meaning of the ADA, protected from discrimination on the basis of disability.

8. Plaintiff was at all times a "person" within the meaning of the City Law, protected from discrimination on the basis of disability.

9. Plaintiff was an individual who suffered from a "disability" (cardiac disease) as defined by the ADA and City Law.

10. Plaintiff was an individual who suffered from a "serious health condition" and was receiving continuing treatment as defined by the FMLA.

11. Plaintiff was at all times an "eligible employee" within the meaning of the FMLA in that he had been continuously employed by Defendants for more than one (1) year and had worked more than 1250 hours in the preceding one year period prior to his medical leave.

### *Defendant*

12. AKC is the recognized and trusted expert in breed, health and training information for dogs.

13. AKC is the registry organization for all AKC-recognized breeds.

14. AKC maintains a principal place of business at 101 Park Avenue, 5th Floor, New York, NY 10178.

15. APC is a dog day care center with several locations throughout the City of New York.

16. APC maintains a principal place of business at AKC's offices at 101 Park Avenue, 5th Floor, New York, NY 10178.

17. At all relevant times, Defendants engaged in commerce or in an industry or activity affecting commerce and employed more than fifty (50) employees for each working day during each of the twenty (20) or more calendar workweeks in the current or preceding calendar year and accordingly are "employers" within the definition of the FMLA and ADA.

18. At all relevant times hereto, Defendants have continuously been doing business in the State and City of New York and have continuously employed more than four (4) people, and accordingly are "employers" within the definitions of City Law

19. AKC owned and operated six APC locations in New York City.

20. AKC hired all of the workers who worked at each of the APC locations and set compensation and maintained employment records for APC employees.

21. AKC and APC both employed Plaintiff.

22. AKC set Plaintiff's compensation.

23. Three of the five APC Board Managers were also AKC Board Directors and/or executives.

24. AKC and APC are owned and/or operated by the same individuals including Defendant Dennis Sprung.

25. On June 26, 2017, AKC advertised on its website the acquisition by APC of all SPOT Canine Club's locations in New York City.

26. Plaintiff and two other APC employees worked at AKC's corporate headquarters.

27. APC employees utilized AKC conference rooms for senior staff meetings and

training sessions.

28. All Human Resource and personnel communications for APC came from AKC.

# FACTUAL ALLEGATIONS
### *Background regarding Plaintiff's Employment*

29. Mr. Tysseling commenced employment as Chief Operating Officer (COO) of APC on October 9, 2017.

30. During his first year as COO, Mr. Tysseling was primarily responsible for the budgeting and execution of construction renovations and re-branding of the New York City canine locations the Organization had acquired from Spot Canine Club, with the ultimate goal of making the locations profitable.

31. At all times during his employment, Mr. Tysseling carried out his job duties with diligence and care, consistently meeting or exceeding the Organization's legitimate performance expectations.

32. He received recognition and commendation from colleagues and senior executives for APC's increasing success and his strong work performance.

33. He forecasted profitability for all locations within 18 months of rebranding, which was a timetable he derived from having spread-headed the opening of 150 canine locations at his previous employer, Pet Smart.

34. In accordance with his plan, APC locations were on track to be profitable by July 2020.

35. Indeed, as of his last report to the AKC Board of Directors, two locations were already profitable.

36. Every other month, AKC/APC Chief Executive Officer (CEO) Dennis Sprung and AKC Chief Financial Officer Joseph Baffuto presented APC's financial reports to the Board

of Directors. When requested, Plaintiff also presented to the AKC Board of Directors.

37. Mr. Tysseling also presented these financial reports to APC's Board of Managers (which included CEO Sprung and CFO Baffuto) three times annually.

38. The reports reflected a month-over-month increase in revenue trending toward profitability within Mr. Tysseling's projected timeline.

39. Mr. Tysseling was never criticized nor disciplined at any time for APC's alleged failure to meet budget.

40. The one time his financial reports were scrutinized before presentation to the Board of Directors, he received feedback to make only minor changes with respect to his delivery and the message being shared – not with respect to content.

41. In Spring of 2018, APC's most senior manager and software developer, Josh Stein, resigned.

42. His resignation left a large gap in financial oversight and reporting tools for the Organization

43. In an effort to be fiscally responsible, rather than hiring a senior manager at a high salary, Mr. Tysseling retained a qualified consultant to perform Mr. Stein's functions.

44. Mr. Tysseling was forced to hire other consultants and vendors as well because he did not have any internal resources in the areas of marketing, advertising, sales, information technology, and social media.

45. CEO Sprung, CFO Baffuto, AKC's Board of Directors and APC's Board of Managers were well aware that Mr. Tysseling was using consultants to develop the business.

46. There was virtually no other way for work to get done.

47. AKC paid the consultants' invoices.

48. All expenses were included in monthly reports presented to AKC's Board of Directors.

49. One of the vendors, K-Roll, performed in-office sales training for employees in corporate headquarters using a conference room for two full afternoons.

50. Mr. Tysseling had also informed CFO Baffuto that K-Roll was creating graphs and comparative charts using information provided by Mr. Tysseling to present to the Board of Directors.

51. Another vendor, 8-Foot, used eight AKC employees to create marketing and safety-training videos with Human Resource's knowledge and permission.

52. Yet another vendor for APC was an existing contractor for AKC. He was engaged by APC without a contract with knowledge of AKC's legal department, IT department, Baffuto and Sprung.

53. Mr. Tysseling showed to CEO Sprung promotional items created by another vendor, Green and Associates, which had been previously retained by AKC.

54. The Organization was aware in each instance that Mr. Tysseling was using third parties and never once questioned the manner by which the third parties were retained.

55. At no time did anyone inform Mr. Tysseling that he needed to enter into a contract with consultants and vendors prior to using their services.

56. It wasn't until Mr. Tysseling received an email invite for a meeting in September 2019 (while he was on a medical leave of absence) with a group of his senior managers that Mr. Tysseling learned of the contract requirement.

57. The email invite included copies of AKC's legal forms for retaining third parties.

58. Mr. Tysseling was dropped from the meeting invite almost immediately thereafter.

59. Mr. Tysseling later learned that APC managers in the meeting were apprised, for the first time, of the process for retaining third parties and were warned that they could be disciplined for having used third party services without agreements.

## *Mr. Tysseling's Heart Attack and the Organization's Unlawful Termination*

60. While leaving the office on August 15, 2019, Mr. Tysseling suffered a heart attack and was found by an AKC employee face down in an elevator.

61. The building's security staff refused to administer CPR to Mr. Tysseling.

62. Fortunately, a good Samaritan who happened to be a cardiologist came by and immediately began CPR on Mr. Tysseling.

63. Mr. Tysseling was admitted to the hospital where he remained in a coma for seven days and in recovery for another week.

64. For two months, he continued his recovery at home with cardiac rehabilitation three times weekly.

65. During Mr. Tysseling's recovery, CFO Baffuto called him to inquire about the services the third parties had been providing to APC.

66. Even then, CFO Baffuto did not question whether Mr. Tysseling had entered into contracts with these providers.

67. On October 14th, Mr. Tysseling's cardiologist approved his return to work with the continuation of cardiac rehabilitation three times weekly.

68. Mr. Tysseling and his wife visited AKC's offices that same day to give the form by hand to L.B. Dean of Human Resources, who they believed would be in town for a Board of

9

Directors' meeting.

69. Ms. Dean was not available to accept the form, as she was in the meeting for over an hour.

70. Mr. Tysseling and his wife left the office and by 4:00 p.m. that day, Mr. Tysseling received an email informing him that CEO Sprung wanted to see him the next morning at 8:15 a.m.

71. When Mr. Tysseling reported to work as requested on October 15th, he was asked to meet with CEO Sprung and Ms. Dean, who presented him with a letter summarily terminating his employment.

72. The Organization claimed that Mr. Tysseling breached AKC policy by entering into unauthorized and costly arrangements with consultants.

73. As stated above, the Organization never apprised Mr. Tysseling of the policies or procedures for engaging third parties.

74. Several people, including the CEO, CFO, Human Resources, the Board of Directors and Board of Managers were aware that Mr. Tysseling had retained consultants to perform services and all invoices were paid by the Organization.

75. It is confounding that the Organization claimed these arrangements were unauthorized.

76. Moreover, hiring consultants was more economically feasible and cost effective than hiring employees to perform the myriad tasks necessary to rebrand APC.

77. The Organization also claimed that Mr. Tysseling presented as his own materials that had been created by third-parties.

78. CEO Sprung and CFO Buffato were consistently aware that K-Roll had created

the charts being presented to the Board of Directors.

79. Indeed, Mr. Tysseling provided to K-Roll the data and information which was used to create graphs and charts for ease of presentation to the Board.

80. Lastly, the Organization falsely alleged that Mr. Tysseling failed to meet budget.

81. The budget was provided by AKC and incorrectly included line items for corporate overhead and royalties – neither of which were substantiated or within Mr. Tysseling's control.

82. The more accurate financial documentation prepared on a cash basis by APC's accountant (without inappropriately applied corporate overhead and royalties) clearly demonstrated that APC was performing as Mr. Tysseling predicted and as he presented multiple times to the Boards.

83. Accordingly, the reasons cited by the Organization for Mr. Tysseling's termination were merely a pretext for unlawful discrimination and retaliation.

**FIRST CAUSE OF ACTION**
**(FMLA Interference)**

84. Plaintiff repeats and realleges all paragraphs above as though fully set forth herein.

85. By the acts and practices described herein, the Organization interfered with Plaintiff's FMLA rights.

86. The Organization's violations of Plaintiff's FMLA rights were willful and intentional.

87. As a proximate result of the Organization's unlawful acts of discrimination, Plaintiff has endured emotional pain, emotional suffering, inconvenience, mental anguish, loss of enjoyment of life, loss of personal dignity, loss of self-esteem, loss of career fulfillment,

embarrassment, humiliation and harm to his reputation.

88. As a proximate result of the Defendant's unlawful acts of discrimination, Plaintiff has suffered and continues to suffer substantial losses in past and future earnings and other fringe benefits.

## SECOND CAUSE OF ACTION
### (FMLA Retaliation)

89. Plaintiff repeats and realleges all paragraphs above as though fully set forth herein.

90. By the acts and practices described herein, the Organization fired Plaintiff in retaliation for him seeking to exercise his rights pursuant to the FMLA.

91. The Organization's violations of Plaintiff's FMLA rights were willful and intentional.

92. As a proximate result of the Organization's unlawful acts, Plaintiff has endured emotional pain, emotional suffering, inconvenience, mental anguish, loss of enjoyment of life, loss of personal dignity, loss of self-esteem, loss of career fulfillment, embarrassment, humiliation and harm to his reputation.

93. As a proximate result of the Organization's unlawful acts, Plaintiff has suffered and continues to suffer substantial losses in past and future earnings and other fringe benefits.

## THIRD CAUSE OF ACTION
### (Failure to Provide a Reasonable Accommodation in Violation of the ADA)

94. Plaintiff repeats and realleges all paragraphs above as though fully set forth herein.

95. Plaintiff suffered from a disability and requested a reasonable accommodation for his disability.

96. By the acts and practices described herein, the Organization violated the ADA by failing to accommodate Plaintiff's disability.

97. The Organization's acts were willful and intentional.

98. As a proximate result of the Organization's unlawful acts of discrimination, Plaintiff has endured emotional pain, emotional suffering, inconvenience, mental anguish, loss of enjoyment of life, loss of personal dignity, loss of self-esteem, loss of career fulfillment, embarrassment, humiliation and harm to his reputation.

99. As a proximate result of the Organization's unlawful acts of discrimination, Plaintiff has suffered and continues to suffer substantial losses in past and future earnings and other fringe benefits.

**FOURTH CAUSE OF ACTION**
**(Discriminatory Termination of Employment**
**Based on Disability in Violation of the ADA)**

100. Plaintiff repeats and realleges all paragraphs above as though fully set forth herein.

101. Plaintiff's suffered from a disability within the meaning of the ADA.

102. Defendant willfully violated the ADA when it terminated Plaintiff's employment because of his disability.

103. As a proximate result of the Organization's unlawful acts of discrimination, Plaintiff has endured emotional pain, emotional suffering, inconvenience, mental anguish, loss of enjoyment of life, loss of personal dignity, loss of self-esteem, loss of career fulfillment, embarrassment, humiliation and harm to his reputation.

104. As a proximate result of the Organization's unlawful acts of discrimination, Plaintiff has suffered and continues to suffer substantial losses in past and future earnings and

other fringe benefits.

## FIFTH CAUSE OF ACTION
### (Retaliatory Termination of Employment Based on Requesting a Reasonable Accommodation in Violation of the ADA)

105. Plaintiff repeats and realleges all paragraphs above as though fully set forth herein.

106. Plaintiff engaged in protected activity when he requested a reasonable accommodation for his disability.

107. The Organization willfully violated the ADA when it terminated Plaintiff's employment because he requested an accommodation for his disability.

108. As a proximate result of the Organization's unlawful acts, Plaintiff has endured emotional pain, emotional suffering, inconvenience, mental anguish, loss of enjoyment of life, loss of personal dignity, loss of self-esteem, loss of career fulfillment, embarrassment, humiliation and harm to his reputation.

109. As a proximate result of the Organization's unlawful acts, Plaintiff has suffered and continues to suffer substantial losses in past and future earnings and other fringe benefits.

## SIXTH CAUSE OF ACTION
### (Failure to Provide a Reasonable Accommodation in Violation of City Law)

110. Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

111. Plaintiff suffered from a disability and requested a reasonable accommodation for his disability.

112. By the acts and practices described herein, Defendants intentionally and willfully violated City Law Section 8-107 by failing to accommodate Plaintiff's disability.

113. As a proximate result of Defendants' unlawful acts of discrimination, Plaintiff

has endured emotional pain, emotional suffering, inconvenience, mental anguish, loss of enjoyment of life, loss of personal dignity, loss of self-esteem, loss of career fulfillment, embarrassment, humiliation and harm to his reputation.

114. As a proximate result of Defendants' unlawful acts of discrimination, Plaintiff has suffered and continues to suffer substantial losses in past and future earnings and other fringe benefits.

**SEVENTH CAUSE OF ACTION**
**(Discriminatory Termination of Employment**
**Based on Disability in Violation of City Law)**

115. Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

116. By the acts and practices described herein, Defendants intentionally and willfully violated City Law by terminating Plaintiff's employment because of his disability.

117. As a proximate result of Defendants' unlawful acts of discrimination, Plaintiff has endured emotional pain, emotional suffering, inconvenience, mental anguish, loss of enjoyment of life, loss of personal dignity, loss of self-esteem, loss of career fulfillment, embarrassment, humiliation and harm to his reputation.

118. As a proximate result of Defendants' unlawful acts of discrimination, Plaintiff has suffered and continues to suffer substantial losses in past and future earnings and other fringe benefits.

**EIGHTH CAUSE OF ACTION**
**(Retaliatory Termination of Employment**
**Based on Requesting a Reasonable**
**Accommodation in Violation of City Law)**

119. Plaintiff repeats and realleges all paragraphs above as though fully set forth herein.

120. Plaintiff engaged in protected activity when he requested a reasonable

accommodation for his disability.

121. Defendants willfully violated City Law when it terminated Plaintiff's employment because he requested an accommodation for his disability.

122. As a proximate result of Defendants' unlawful acts, Plaintiff has endured emotional pain, emotional suffering, inconvenience, mental anguish, loss of enjoyment of life, loss of personal dignity, loss of self-esteem, loss of career fulfillment, embarrassment, humiliation and harm to his reputation.

123. As a proximate result of Defendants' unlawful acts, Plaintiff has suffered and continues to suffer substantial losses in past and future earnings and other fringe benefits.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully requests that this Court enter judgment:

i. back pay, prejudgment interest, front pay and damages for all employment benefits Plaintiff would have received but for the unlawful acts and practices of Defendants;

ii. liquidated damages;

iii. reasonable attorneys' fees and costs incurred in this action; and

iv. any other relief that the Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury.

Dated: December 4, 2020

Respectfully submitted,

**FISHER TAUBENFELD LLP**

By: _____
   Liane Fisher, Esq. (LF5708)
   *Attorneys for Plaintiff*
   225 Broadway, Suite 1700
   New York, New York 10007
   Phone: (212) 571-0700
   Fax: (212) 505-2001